## Fiddler's Administrator v. Chesapeake & Ohio Railway Company.

(Decided March 26, 1926.)

### Appeal from Pike Circuit Court.

1.   Railroads—Pedestrian Traveling Through Railroad Yards to Destination, After Leaving Passenger Train, Held Not Entitled to Lookout or Warning.—Railroad held not required to keep lookout or give warning of train's approach to one who left passenger train at depot, and while walking through railroad yards to destination was struck 1,100 feet from depot, at place where railroad's property was not used by public in such numbers as to impose on railroad duty of anticipating their presence.

2.   Railroads.—Whether conductor on train in railroad yard saw pedestrian in time to avoid injury by exercise of ordinary care held for jury.

ROSCOE VANOVER for appellant.

BROWNING & REED, P. B. STRATTON and KIRK, KIRK & WELLS for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

In this action against the Chesapeake & Ohio Railway Company to recover damages for the death of L. G. Fiddler, the trial court directed a verdict in favor of the defendant, and Fiddler's administrator has appealed.

Shelby, a station on the Chesapeake & Ohio Railway, is located at the junction of that company's Big Sandy division and the Sandy Valley & Elkhorn Railroad. In the yards there are seven tracks on which considerable switching is done. The depot is located at the east end of the yard. In front of the depot is the river, and between the river and the depot are two main line tracks. In the rear of the depot there is a highway running up and down the river. To reach this road the usual method of travel is across the Y track. Between the depot and the river

is a roadway running between the river and the yard tracks. To reach this roadway it is only necessary to cross the two main line tracks in front of the depot. On the day of the accident Fiddler came from Pikeville to Shelby on one of appellee's passenger trains. On his arrival he stayed around the depot for a few minutes. Finally he started west through the railroad yards. On reaching a point 1,100 feet west of the depot he was struck and killed by a train that was backing on track No. 1, and consisted of an engine and five cars. When John Adkins saw Fiddler, Fiddler wanted to know how he could get to the mouth of Shelby. Adkins told him he could go through the yards, but it was dangerous. He then took Fiddler across the track and showed him the road through the bottom. Nick England, who was brakeman on the train that killed Fiddler, testified that the train was going west. He was on the head box car next to the engine, and was there for the purpose of riding to the other end of the yards. He could not say whether the bell was ringing or the whistle blowing at the time. About the same time there was a freight train moving on the main line track next to the depot and it was making considerable noise. He did not see any person in front of the train on which he was riding, and did not know of the accident until the engineer made a violent stop. There was sufficient clearance for any one to travel between tracks 1 and 2. Manford Estep, who was appellee's car inspector at the time, testified that the yards were used considerably by employes, but not by people generally in traveling up and down the river. He also stated that Fiddler wanted to see James Haley and Charles Coleman and asked how he could get down there. He showed him the road and Fiddler said, "I believe I'll go down through the yard." He cautioned Fiddler that in doing so he might get run over by a train. G. J. Johnson, appellee's engineer, testified as to the location of the tracks and physical conditions at Shelby. Lee Clark, the engineer of the train that killed Fiddler, testified that there was an engine and caboose going west on the main line. They started about the same time and ran a car length together. All at once the other engine pulled away. About that time the conductor, who was standing on the steps, gave a violent stop signal. He applied the emergency brake, shut off the steam and did all he could to stop. When they got off they discovered they had struck a man.

He did not see the decedent on track No. 1 until after they struck him. At the time of the accident they were running four or five miles an hour. C. M. Kiser, one of the company's engineers, was coming east through the yard on the occasion in question. He met Fiddler and spoke to him. Witness stepped over on track No. 1 and Fiddler stepped off between track No. 1 and track No. 2. After the engine and caboose passed, witness stepped back on track No. 2. He then saw the conductor give a violent stop signal. This occurred only a few seconds after he left Fiddler. He further testified that the yards were not used by the public to any extent for the purpose of travel, but were used by the employes. Finney Ratliff, the fireman, did not learn of the injury until the whistle sounded and the emergency brake was applied. Joe Windburn was the conductor of the train. W. B. Ratliff, who was also on the train, testified that he was standing on the step next to the engine. He saw the conductor give the engineer the stop signal and the engineer blew his whistle. The first thing he noticed, the paper flew out of decedent's coat on the side of the track. He never saw decedent before he was struck. H. C. Marrs, the yard master, learned of the accident three or four minutes after it occurred. He and a man by the name of Mordica went to where the body lay. He was lying with his shoulder upon the rail and his head pushed off. In his coat was a bottle containing a small quantity of liquor. Mordica testified to the same effect.

After hearing the foregoing evidence counsel for plaintiff was permitted to read the affidavit filed by appellee for a continuance as the deposition of Joe Windburn. His evidence is as follows:

"I was conductor in charge of the train on the day L. G. Fiddler was run over at Shelby, Ky., and killed on September 23rd, 1923; we were operating yard train No. 629 and was backing down west on yard track No. 1 to west end of the yard with five cars and a caboose at the time he was backing down through the yards with this engine and cars, the engine being headed east and was, there was a Mallet engine also going west on the main line track in advance of us, which Mallet made considerable noise as it went down said main line track, I saw the deceased man Fiddler walking in between track No. 1 and main line track; afterwards he crossed over

No. 1 track onto No. 2 track and was walking down No. 2 track with his back towards the engine which we was on, that was backing down on No. 1 track.

"Then he walked about a car length on No. 2 track and just before the train reached the position about where I last saw the deceased he stepped down off No. 2 track out of my sight and was going west and seemed to be intending to travel between track No. 1 and track No. 2; immediately after he got out of my sight he was struck by the train and killed; if Mr. Fiddler had stayed on track No. 2 as he traveled west he would have been in a safe place and free from injury by the train, or if he had walked along between track No. 1 and track No. 2 he would have been in no danger of injury from said train. After he stepped off track No. 2, I thought he was intending to walk down between track No. 1 and track No. 2, and if he had done so he would not have been in position to have been injured by the train; during all the time he traveled west he to my knowledge did not look back in the direction of the train, but during the time I observed him he was at all times in a place of safety. I thought when he stepped off of track No. 1 that he was getting out of the way of the train which I was on going west on No. 1 track; I was standing on the steps of the engine on the engineer side as the train was going down on track No. 1 and before said train reached the position where I last saw said Fiddler he was then in a place of safety and evidently just before the train reached the position where I last seen him he stepped over onto track No. 1 immediately in front of the cars and was run over and killed.

"If Fiddler had remained on the track or position where I last observed him he would have been free from any injury from the train which we were running down on track No. 1."

Counsel for appellant insists that, as the depot was entirely surrounded by tracks, the decedent should not be held to be a trespasser while making an effort to leave the depot. It may be conceded that, if the decedent had been crossing the tracks at or near the depot for the purpose of reaching the public road at either side of the depot, a different question would be presented. As a matter of fact, however, decedent was not near the depot or attempting to cross the tracks for the purpose of

reaching one of the public roads. On the contrary, he was making a footway of the railroad yards and traveling along its tracks for the purpose of reaching his destination. Not only so, but he was 1,100 feet from the depot at the time the accident occurred. It was not shown that the yards or tracks of the company were used by the general public in such large numbers at the place of the accident as to impose on the company the duty of anticipating their presence and taking precautions for their safety. It is apparent, therefore, that neither decedent's relation to the company nor the place where the injury occurred was such as to require the company to keep a lookout or give warning of the train's approach.

It remains to determine whether the evidence was sufficient to show a failure to use ordinary care to avoid injuring decedent after his peril was discovered. Next to the depot is the main line. North of the main line is track No. 1, and next to track No. 1 is track No. 2. The train which killed Fiddler was on track No. 1. On track No. 2 there was another train going in the same direction somewhat in advance of the train on track No. 1. The conductor was on the steps on the engineer's side of the engine. He says that when he first saw Fiddler, Fiddler was between the main line on the left and track No. 1. After that Fiddler crossed over track No. 1 to track No. 2. He then left track No. 2 and started as if he intended to go between track No. 1 and track No. 2. If he had done this, he would not have been in position to be injured by the train. During all the time that he traveled west he did not look back in the direction of the train. During the time that witness observed Fiddler, Fiddler was in a place of safety. Just before the train reached the position where he last saw Fiddler, Fiddler was in a position of safety, and, evidently, just before the train reached the point where he was last seen by witness he stepped over on track No. 1 immediately in front of the car and was run over and killed. This is not a case where a pedestrian was walking along on the outside of a single track. Fiddler was in a yard where there was a network of tracks. Just prior to the accident two trains were moving in the same direction. Fiddler's presence on and about the tracks was known. He was seen to be stepping backwards and forwards across the tracks. Just prior to the accident his back was to the approaching train and he stepped back from track No. 2. He could not step from track No. 2 without going in the direction of track No. 1.

If he continued in that direction he would necessarily step on track No. 1. If he went down between the tracks his position was such that a step or two to the left might bring him in contact with the approaching train. In view of the situation thus presented, we are constrained to hold that it was for the jury to say whether the conductor saw Fiddler's peril in time to avoid injuring him by the exercise of ordinary care.

Judgment reversed and cause remanded for a new trial consistent with this opinion.